IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ROBERT L. CRITES,

        Plaintiff,

v.                                      Case No. 16-1397-JWB

CITY OF HAYSVILLE, KANSAS,

        Defendant.

## MEMORANDUM AND ORDER

This case comes before the court on Defendant's Motion for Summary Judgment. (Doc. 60.) The motion has been fully briefed and is ripe for decision. (Docs. 60, 61, 68, 70, 74, 78.) Plaintiff Robert Crites, formerly a lieutenant with the City of Haysville Police Department, claims the City violated his rights under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq., the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112 et. seq., and the federal Rehabilitation Act of 1972, 29 U.S.C. § 701 et seq., when it terminated his employment. Defendant's motion is GRANTED IN PART, and DENIED IN PART, for the reasons set forth herein.

### I. Uncontroverted Facts

The court finds the following facts to be uncontroverted for purposes of the motion for summary judgment.

Plaintiff Robert L. Crites is a resident of Sumner County, Kansas. He was hired as a patrol recruit for the City of Haysville's police department on December 29, 1996. For

more than 17 years, he performed well as a police officer, and was promoted to the rank of lieutenant in 2007. (Doc. 68 at 2.)

The job description for a lieutenant in the City's handbook provides that the essential functions of the position include supervising major investigations, investigating crime scenes and citizen complaints, and responding to major or sensitive incidents. The essential functions also include preparing work schedules, answering phone calls, dealing with the public, and conducting background investigations on police applicants. On May 21, 2014, Plaintiff participated in an annual review and his performance was rated as satisfactory overall and outstanding in several areas. (Doc. 61 at 2; Doc. 68 at 2-3.)

Between August 19, 2014, and May 29, 2015, Plaintiff was an "eligible employee" and Haysville was an "employer" as defined by both the FMLA and ADA, 29 U.S.C. § 2601 et seq. and 42 U.S.C. § 12101 et seq. Haysville is a local government entity that receives federal funds for the purposes of the Rehabilitation Act.[1] (Doc. 68 at 3-4.)

As part of Plaintiff's duties as a lieutenant, he had to occasionally respond to calls. Disturbance calls required a sergeant or a lieutenant to be present. Situations involving weapons are considered disturbance calls. (Doc. 61 at 2.)

On August 19, 2014, Plaintiff and two other Haysville officers responded to a domestic disturbance call. Upon arriving at the scene, they discovered a suspect holding

---

[1] For purposes of the instant motion, the ADA and Rehabilitation Act requirements are the same. *See Nielson v. Moroni Feed Co.*, 162 F.3d 604, 608 n. 7 (10th Cir. 2007). The court therefore refers hereafter only to the ADA.

a knife to his girlfriend's throat. To prevent harm to the female victim, Plaintiff shot and killed the suspect. (Doc. 61 at 2.)

After the shooting, Plaintiff was placed on administrative leave beginning August 19, 2014. Plaintiff was examined by a psychologist, Dr. Kerin Schell, on August 20, 2014. Dr. Schell notified Haysville's Chief of Police, Jeffrey Whitfield, of his conclusion that Plaintiff "can return to duty immediately." Schell found Plaintiff was not having difficulty dealing with the incident emotionally, but indicated he could do a follow-up evaluation if problems subsequently developed.  (Doc. 61 at 2-3.)

Plaintiff did not believe he was fit to return to duty at that time. He felt he was having problems that should have prevented him from immediately returning to duty. He was experiencing a lot of anxiety, visions, and obtrusive thoughts. On August 21, 2014, Plaintiff sent a text message to Chief Whitfield expressing concerns about the quality of Dr. Schell's assessment. Whitfield texted in response that "we will have to look at that to see about using someone else." (Doc. 61 at 3.)

In response to Plaintiff's concerns, Whitfield contacted the Sedgwick County Sheriff's Office and the Wichita Police Department to find out what doctors they used. Bruce Nystrom, Ph.D. was recommended to him. Haysville referred Plaintiff to see Dr. Nystrom, but Nystrom was not available so Plaintiff saw his associate, Molly Allen, Psy.D.  (Doc. 61 at 3.)

On September 4, 2014, Dr. Allen sent a letter to Chief Whitfield indicating that Plaintiff "shows some mild signs of some preoccupation and sleep disturbance" but that

he "is fit to return to regular duty as of Monday September 8, 2014." Plaintiff returned to regular duty on September 8, 2014. (Doc. 61 at 3.)

During Plaintiff's first week back at work, the department received a disturbance call from the same apartment complex where the August 19th shooting had taken place. Plaintiff responded to the call. This made him feel "very apprehensive." At some point after the call, Plaintiff reported to Chief Whitfield that he was not able to perform his regular duties and that he needed additional time off. (Doc. 61 at 4.)

Plaintiff was seen by Jerry Niernberger, D.O., his primary care physician, on September 16, 2014. Niernberger prescribed Ambien to help Plaintiff sleep. Sometime thereafter, he prescribed Lexapro, an anti-depressant. Plaintiff continues to take these medications. (Doc. 61 at 4.)

Plaintiff last worked on September 24, 2014. He began using his accumulated paid sick leave on September 29, 2014.

On or about October 1, 2014, Dr. Niernberger notified Haysville that Plaintiff was not to work for two weeks because he was suffering from Post-Traumatic Stress Disorder (PTSD). On October 15, 2014, Niernberger informed Plaintiff that he should not work until further notice. (Doc. 61 at 4.)

Thereafter, Plaintiff sought treatment from Jeremy Crosby, Psy.D. Crosby is a psychologist who specializes in the treatment of trauma and PTSD. He has provided treatment to military and civilian police officers in a clinical setting. He has treated many patients with severe PTSD who returned to military service or law enforcement careers, as well as some who had to retire or seek disability because they were not going to be

able to function in the job. Crosby first evaluated Plaintiff on October 31, 2014, and diagnosed "PTSD, Moderate." On November 7, 2014, Crosby changed his diagnosis to "PTSD, Chronic, Severe." This remained Crosby's diagnosis for the remainder of the time he treated Plaintiff. Dr. Crosby sent a letter to Haysville on November 12, 2014, stating in part:

> Robert has been diagnosed with Post-Traumatic Stress Disorder that was caused by the officer-involved shooting that occurred in mid-August 2014.
>
> Due to the severity of Robert's current symptoms, he is unable to work for the next 12 weeks.

Five days later, on November 17, 2014, Plaintiff came in to the Police Department to speak with Chief Whitfield about the possibility of returning to work on a limited basis. Whitfield informed Plaintiff that before he could come back, he would have to obtain a full release from his doctor clearing him to do so. Plaintiff never had any further discussions with Whitfield about a partial return to work. (Doc. 61 at 5.)

Dr. Crosby never recommended to Plaintiff that he return to work on a limited basis. In fact, Crosby counseled against it. Crosby believed returning to work on a limited basis would be counter-therapeutic and detrimental to Crites. Crosby did not release Plaintiff to return to work on a limited or part-time basis at any point. Crites never provided a release from any health care provider allowing him to return to work on a part-time or limited basis. Dr. Crosby continued to treat Plaintiff. (Doc. 61 at 6.)

As of November 24, 2014, Plaintiff did not feel safe to be on calls, and he informed Chief Whitfield of this feeling.

On February 5, 2015, Dr. Crosby sent a letter to the Haysville Police Department stating in part:

> Robert has been diagnosed with Post-Traumatic Stress Disorder that was caused by the officer-involved shooting that occurred in mid August, 2014.
>
> Due to the severity of Robert's current symptoms, he continues to be unable to work for the next 10 weeks.
>
> Dr. Crosby reported he was treating Plaintiff in outpatient treatment and Plaintiff

was "complying fully with the treatment process and is making steady progress." (Doc. 61 at 6-7.)

The next week (February 12, 2015), as a result of Plaintiff's situation, Chief Whitfield emailed KS-CPOST asking whether an officer diagnosed with PTSD is disqualified from being a law enforcement officer. KS-CPOST is the state agency that oversees the granting of licenses to all Kansas law enforcement officers. KS-CPOST responded: "The fact that an officer is diagnosed with PTSD alone is not a disqualifier for certification" and a mental condition is an issue "only when it is found to adversely affect the [officer's] ability to perform the essential functions of a … law enforcement officer with reasonable skill, safety and judgment." (Doc. 68 at 14-15.)

Chief Whitfield consulted with Haysville's Chief Administrative Officer (Will Black), City Attorney (Alison McKenney Brown), and City Clerk (Janie Cox) about Plaintiff's leave of absence. On March 30, 2015, Whitfield emailed the City Clerk with a new return-to-work release form that all departments of the City would be using. He stated "the reason I am sending it over to you now is that Bob Crites will be notified that he will need this release completed before any decision can be made on his return to

work," and Plaintiff had told him "he anticipates the Doctor will release him soon." The City Attorney and all department heads had been involved in revising the form beginning in September 2014. On March 31, 2015, Whitfield emailed Black and Cox with a "Crites update" saying Plaintiff expected to be released for work within the next three weeks and "I think we should probably meet with [City Attorney Brown] on the issue, and probably with the Mayor as well to discuss his continued employment after this ordeal." (Doc. 68 at 15.)

On April 1, 2015, Whitfield received an email from Captain Bruce Powers of the Haysville Police Department reporting that he had looked at his notes and found five instances in 2014 when Plaintiff had, in Powers's opinion, failed to perform assigned duties. Whitfield had asked for this information, which had not been included in Plaintiff's 2014 performance evaluation. At some point during Plaintiff's leave, Whitfield partially filled out a disciplinary action form listing the foregoing incidents in which Plaintiff allegedly failed to complete assignments, but the form was never given to Plaintiff or placed in his personnel file.  (Doc. 68 at 15-16.)

On April 1, 2015, Chief Whitfield sent a letter to Crites stating as follows:

As of April 1, 2015, you have exhausted all of your available sick leave. Since you told me you will be off work for at least a few more weeks, we will need a written request from you to use your vacation time for the remaining period of time you are off. We will need this request before April 9, 2015. If you need to take more time after that, you will need to get the appropriate FMLA paperwork filled out. Please keep us posted on your return to work status.

(Doc. 61 at 7.) Aside from its FMLA policy, this was the only written communication from Haysville to Crites concerning the FMLA.

As of April 1, 2015, Plaintiff knew he had exhausted all of his available sick leave. By letter of April 6, 2015, he wrote Whitfield requesting to use his vacation time:

> As I am out of sick time April 1, 2015 and my doctor has not released me, I would like to request using my vacation time until my return or until it is depleted.

(Doc. 61 at 7.)

Plaintiff met with Dr. Crosby on April 20, 2015. The examination notes reflect that "Robert reports that he now has approximately one week of sick leave remaining. He provided paperwork for returning to work, with an expected return date of Monday, April 27." Dr. Crosby's diagnosis of Plaintiff on April 20, 2015, continued to state: "309.81 Post Traumatic Stress Disorder, Chronic, Severe." Plaintiff told Crosby during the April 20 appointment that he was "running out of benefits" and needed to go back to work. At that time, Plaintiff had already exhausted or was very close to exhausting all of his paid leave. Three days later, on April 23, 2015, Dr. Crosby signed Haysville's Return to Work Release Form indicating Plaintiff could return to work on April 27, 2015, without restrictions. On the release form, which was provided by Chief Whitfield, Crosby indicated that Plaintiff could (among other things) supervise law enforcement personnel, interact with the public in a law enforcement capacity, and carry and appropriately use all law enforcement equipment, including weapons. Crosby offered to provide any additional information, but the City never requested any. (Doc. 61 at 7-8.)

Crosby testified he had not read the International Association of Police Chiefs fitness-for-duty evaluation guidelines in detail and that he had never performed an evaluation in accordance with those guidelines. The City never informed Plaintiff that it

needed a fitness-for-duty examination from Crosby as a condition of reinstating Plaintiff. Crosby was Plaintiff's treating therapist for about six months. His opinion regarding Plaintiff's ability to return to work was given in the context of his treatment relationship with Plaintiff. Crosby did not completely release Plaintiff from his care, but requested insurance authorization for two additional treatment sessions. (Doc. 61 at 8-9.)

Chief Whitfield received the Return to Work Release Form completed by Dr. Crosby. Whitfield testified he had concerns about Plaintiff's ability to return to work, in part because of the timing of the release, which coincided with Plaintiff's exhaustion of paid leave. After consulting with the City Attorney and the Chief Administrative Officer, Whitfield decided to require Plaintiff to submit to two fitness-for-duty certifications, one with Dr. Rey and one with Dr. Nystrom. Whitfield made a handwritten outline of topics to discuss with Plaintiff during a scheduled April 27, 2015 meeting, including "Transfer or Rehire" and "You can file for unemployment." (Doc. 61 at 9; Doc. 68 at 18.)

Plaintiff met with Chief Whitfield and Captain Bruce Powers on April 27, 2015, to discuss a possible return to work. Whitfield and Powers discussed with Plaintiff, among other things, whether he was mentally prepared to do his job. They asserted that he would face an "uphill battle" from some subordinates worried about his ability to perform, that he had left some projects uncompleted and would need to complete them in a timely manner or let them know if he was unable to do so, that he had made some insubordinate comments about administration, and that he would not be eligible for an evaluation or pay increase in June because he did not have a body of work to evaluate. During the meeting, which was confrontational in tone, Plaintiff appeared to be nervous

and apprehensive. His knee was shaking and he got emotional at times when talking. Whitfield conceded in his deposition, however, that he did not think Plaintiff's behavior during the meeting was "outside of my realm of what I would expect." Plaintiff was told at the meeting he would have to pass a fitness-for-duty examination pursuant to Haysville's procedure for employees who had extended absences for health-related reasons. (Doc. 68 at 18-19.)

Plaintiff was sent to Del Rey, M.D., Haysville's workers compensation doctor, for a fitness-for-duty examination, and to psychologist Bruce Nystrom, Ph.D., for an opinion on whether Plaintiff was psychologically fit for duty. Chief Whitfield arranged these examinations. Whitfield spoke to Nystrom by phone and told him Haysville needed a fitness-for-duty examination of Plaintiff. At Nystrom's request, Whitfield provided a brief history of what had occurred. Nystrom also requested and was provided with Plaintiff's performance evaluations and other documents from Haysville.

The information requested by Nystrom was in accordance with the International Association of Chiefs of Police protocols on fitness-for-duty examinations, which call for the examiner to obtain a description of the objective evidence giving rise to concerns about the employee's fitness for duty.

In a cover letter sending requested materials to Nystrom, Whitfield stated:

I did visit with him last week and talked about some things that will be challenges for him coming back. We also talked about some performance issues that were not discovered until he was on leave. He was emotional during our meeting and had issues with his leg being restless the entire time we talked. My feeling from the meeting was that he did not seem ready to come back, but felt that he needs to come back because he is out of paid time off.

(Doc. 74-7.)

Dr. Rey issued his report on May 20, 2015, concluding that Plaintiff was able to return to his position. Dr. Rey's report stated in part:

> Officer Crites has taken a very active role in working through his situation with the desire to [return] to his prior position once he felt he was able to handle the stresses and duties related to this position. In [a] comprehensive analysis of the counselor with Affiliated Family Counselors, it is noted that Office[r] Crites did indeed improve significantly over a period of time and felt as if he had had a significant improvement in his anxiety with resolution as well as [developing] coping styles to deal with post traumatic issues related to the memories associated to the shooting. At the conclusion of his therapeutic sessions, it appears as he is dealing quite well with his PTSD as well as his anxiety symptoms. Upon discuss[ing] this with Officer Crites during his office visit, I do believe that he is able to return to his position.

Dr. Rey offered to provide additional information as needed. The City did not request any additional information from Rey.  (Doc. 68 at 20.)

Dr. Nystrom examined Plaintiff on May 5, 2015, and issued a written report on May 21, 2015. Nystrom administered the following tests: MMPI-2, MCMI-III, Shirley-2, and Impact of Event Scale-Revised. Nystrom believed Plaintiff was having a lot of symptoms consistent with PTSD. Nystrom's report stated that Plaintiff "continues to exhibit negative emotional responses to the critical stress event. He also reports experiencing re-traumatization arising from prior critical incident stress events." Nystrom concluded:

> Lt. Crites clearly indicated that he wants to return to full, unrestricted duty at this time and that his primary motivation for this is because his employee health benefits have been exhausted. However it is felt that due to the ongoing critical incident stress symptoms he is experiencing combined with recall of prior critical incident stress events producing symptoms and the ongoing stress of parenting several special needs children, he is not currently fit for duty. It should be noted that these evaluation results and

> recommendations are based upon [the] officer's current status and should
> be considered valid only for the next year.

(Doc. 61-17 at 5.)

Based on Dr. Nystrom's evaluation, Chief Whitfield met with Plaintiff on May 28, 2015, and gave him three options: (1) transfer to a full-time civilian position with full benefits within the police department; (2) resign, or (3) be terminated. The civilian position offered to Plaintiff was a Community Resource Specialist or "CRS." It has less responsibility than that of a police lieutenant and has no supervisory duties. It is more of a clerical job involving entering records and answering phones, and pays less than the lieutenant position. (Doc. 68 at 21.)

On May 29, 2015, Chief Whitfield and Plaintiff met at the Sedgwick County District Attorney's office, where the District Attorney informed them that the DA's investigation of the August 19, 2014 shooting was completed and that Plaintiff was cleared of any wrongdoing. Later in the day, Plaintiff met with Whitfield and informed him that he was declining the civilian position and would not resign. Whitfield advised Plaintiff that in light of his decision his employment was terminated. (Doc. 68 at 21.)

Haysville's personnel manual provides that an employee must make a request for accommodation under the ADA as follows:

> If an employee becomes restricted in a major life function, a request for accommodation may be made to the employee's Department Head. The request must be made in writing and must include the specific accommodation requested. Proof of the disability and work restrictions must be provided by a licensed physician at the time of the request. Every reasonable attempt will be made to provide accommodation to allow the employee to be a productive member of the City's workforce.

(Doc. 61 at 12.) Plaintiff never considered himself to be disabled at any time after the August 19, 2014 shooting. He never made a written (or verbal) request for accommodation for a disability. He was asking to return to work on a full-time, unrestricted basis.

> The terms of Haysville's FMLA policy in its personnel manual provided:
>
> FMLA leave for up to twelve weeks (480) hours during a twelve month period (beginning with the first day after all accrued, paid leave is exhausted) may be requested or designated for … the employee's own serious health condition.

(Doc. 68-9.)

Under the foregoing policy, an employee must first exhaust all paid leave before becoming eligible for FMLA leave. Plaintiff testified he was vaguely familiar with the FMLA policy and understood that the City's policy required use of all paid leave before FMLA leave could be taken. Plaintiff never made a request for FMLA leave or unpaid leave of any kind.  (Doc. 61 at 12; Doc. 68 at 51.)

In 2014, Haysville's personnel manual contained no provision on extended absences. As of May 15, 2015, however, the Manual provided:

> EXTENDED ABSENCE: When an employee takes six (6) months or more of any individual leave or combined types of leave, the employee will be required to pass a fit-for-duty test administered by the City's workers' compensation doctor prior to returning to work.

(Doc. 68 at 53.)

The Kansas Commission on Peace Officers' Standards and Training (KS-CPOST), after being notified of Plaintiff's termination, conducted an investigation into Plaintiff's certification as a law enforcement officer pursuant to K.S.A. § 74-5611a. KS-CPOST

Investigator Darren Moore requested and received information from Haysville and from Plaintiff. Moore reviewed the Return to Work Release Form signed by Dr. Crosby and the May 21, 2015, fitness-for-duty evaluation by Dr. Nystrom. Moore also interviewed Plaintiff. As a result of its investigation, KS-CPOST issued a Summary Order of Suspension to Plaintiff on August 25, 2016. Plaintiff did not exercise his right to request a hearing on the Suspension Order, which took effect on September 21, 2016, and has not been lifted or modified. Plaintiff has not taken any steps to be reinstated with KS-CPOST. (Doc. 61 at 14-15.)

## II. Summary judgment standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol − Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III. Discussion

### A. FMLA Claim

1. <u>Summary of FMLA arguments</u>. Plaintiff's first claim is that the City unlawfully interfered with, restrained, or denied his exercise of FMLA rights, contrary to 26 U.S.C. § 2615(a)(1).[2] Among other things, he claims the City was on notice no later than November 12, 2014, that he had a serious health condition that might entitle him to FMLA leave, but it failed to give him notice required by FMLA regulations, including notice of eligibility for FMLA leave and an explanation of rights and responsibilities, notice as to whether his leave was designated for an FMLA-qualifying reason, and notice of whether a fitness-for-duty certificate was required for reinstatement. *See* 29 C.F.R. § 825.300 (listing employer notice requirements). He also claims the City violated the FMLA by failing to restore him to his original or an equivalent position and by failing to provide him 12 weeks of unpaid FMLA leave. (Doc. 68.)

The City contends the FMLA interference claim fails as a matter of law because Crites could not have taken FMLA leave under Haysville's policies, he never took FMLA leave, and he never requested to be put on FMLA leave. (Doc. 61 at 18.) It asserts that Crites admits he never requested FMLA leave and that "[a]ny request for FMLA leave would have been contrary to his stated desire to come back to work immediately." (*Id*. at 19). The City also argues the lack of FMLA notice alleged by Crites is immaterial because

---

[2] Both sides characterize plaintiff's FMLA claim as one for interference, as opposed to discrimination or retaliation on account of exercising or attempting to exercise FMLA rights. (Doc. 68 at 57). *See Janczak v. Tulsa Winch, Inc.*, 621 F. App'x 528, 531, (10th Cir. Jul. 30, 2015) (discussing elements of different FMLA theories). The Pretrial Order likewise preserves only an interference claim. (Doc. 59 at 18).

he "does not actually allege that he would have utilized FMLA leave if he had such notice," and he thus does not show prejudice from a lack of notice. (*Id.* at 19-21).

2. Summary of FMLA requirements. The FMLA guarantees eligible employees 12 weeks of leave in a one-year period following certain events, including a serious health condition that makes the employee unable to perform the functions of the employee's position. 29 U.S.C. § 2612(a). It is unlawful for an employer to interfere with, restrain, or deny the exercise or attempt to exercise any FMLA right. *Id.* § 2615(a). An employer who violates the Act is liable to the affected employee for, among other things, damages including any wages or benefits "denied or lost by reason of the violation." *Id.* § 2617(a).

An employee may elect, or an employer may require the employee, to substitute any of the employee's accrued paid leave for FMLA leave for any part of the 12-week period of such leave. When an employee's leave qualifies under both the FMLA and the employer's paid leave policy, the employer may either permit the employee to use his FMLA and paid leave sequentially, or the employer may require that the employee use his FMLA leave entitlement and paid leave concurrently. *Ney v. City of Hoisington, Kan.*, 264 F. App'x 678, 685, n.1, 2008 WL 324203 (10th Cir. 2008) (citation omitted). Nothing in the Act is to be construed so as to discourage employers from adopting leave policies more generous than those required by the FMLA. 29 U.S.C. § 2653.

An employer may require a certification from an employee's medical provider, as a condition of granting FMLA leave, verifying the employee's inability to perform the functions of the position. *Id.* § 2613. If the employer has reason to doubt the certification, it may require the employee to obtain a second opinion at the employer's expense. If

doing so produces conflicting opinions, the employer may require a third opinion from an agreed-upon health care provider, whose opinion shall be controlling. *Id*.

An employee who takes FMLA leave is entitled, upon return from leave, to be restored to the position previously held or to an equivalent one. 29 U.S.C. § 2614. As a condition of restoration, the employer may have a uniformly-applied policy or practice requiring an employee to receive certification from the employee's health care provider that the employee is able to resume work. *Id*. The FMLA has no provision for challenging the certificate of the employee's health provider that the employee is once again able to perform the functions of the job. *See id.* § 2614(a)(4)); 29 C.F.R. § 825.312(b) (employer may not require second or third opinion on an FMLA fitness-for-duty certification).

An employer is subject to extensive notice requirements under the FMLA. *See* 29 C.F.R. § 825.300. Among other things, the employer must give the employee notice of FMLA leave eligibility and rights, notice of how leave is designated and treated, any requirement for providing a certificate validating a health condition, and any fitness-for-duty certification required as a condition for return to work. Failure to follow the notice requirements may constitute an interference with an employee's FMLA rights, if the employee is prejudiced thereby. *Id.* § 825.300(e).

ADA requirements may also apply to a leave situation, because an employee's serious health condition may also be a disability within the meaning of the ADA. The FMLA does not prevent the employer from following the procedures for requesting medical information under the ADA. *Id.* § 825.312(h). According to FMLA regulations, "[r]equirements under the [ADA], as amended, apply. After an employee returns from

FMLA leave, the ADA requires any medical examination at an employer's expense by the employer's health care provider be job-related and consistent with business necessity." *Id.* § 825.312(h). *See also* 42 U.S.C. § 12112(d)(4)(A) (medical examination may be required only if it is "shown to be job-related and consistent with business necessity").

The Department of Labor modified the FMLA regulations in 2008 because it appeared "that both employers and employees are confused regarding the interaction between the ADA and FMLA in relation to fitness-for-duty certifications." *The Family and Medical Leave Act of 1993*, 73 FR 67934-01, 2008 WL 4898395, *60836 (Nov. 17, 2008). The Department changed the regulation "to make clear that, once an employee returns from work and is no longer on FMLA leave, an employer may require a medical exam under the guidelines and restrictions imposed by the ADA. At that point, the FMLA's fitness-for-duty regulation no longer applies." *Id.* The regulations further provide that a return to work from FMLA leave, supported by a fitness certification of the employee's health care provider, may not be delayed while the employer arranges for an additional ADA medical examination:

> A medical examination at the employer's expense by an employer's health care provider may be required only after the employee has returned from FMLA leave and must be job-related and consistent with business necessity as required by the ADA. Thus, if an employer is concerned about the health care provider's fitness-for-duty certification, the employer may, consistent with the ADA, require a medical exam at the employer's expense after the employee has returned to work from FMLA leave as stated in paragraph (h) in the final rule. The employer cannot, however, delay the employee's return to work while arranging for and having the employee undergo a medical examination.

*Id.*, 2008 WL 4898395, at *68034.

3. <u>Merits of FMLA claim</u>.

"To establish an FMLA interference claim, 'an employee must show that: (1) he was entitled to FMLA leave; (2) an adverse action by his employer interfered with his right to take FMLA leave; and (3) this adverse action was related to the exercise or attempted exercise of the employee's FMLA rights.'" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 978 (10th Cir. 2017) (citing *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226 (10th Cir. 2012)). Additionally, for a claim to be actionable, a plaintiff "must show prejudice as a result of the FMLA violation." *Speight v. Sonic Restaurants, Inc.*, 983 F. Supp. 2d 1324, 1329 (D. Kan. 2013).

To satisfy the second element above, the employee must show "that [he] was prevented from taking the full 12 weeks … of leave guaranteed by the FMLA, denied reinstatement following [FMLA] leave, or denied initial permission to take [FMLA] leave." *Dalpiaz v. Carbon Cty., Utah*, 760 F.3d 1126, 1132 (10th Cir. 2014). "Thus, an interference claim arises when an adverse employment decision is made before the employee has been allowed to take FMLA leave or while the employee is still on FMLA leave." *Id*.

The uncontroverted facts show—and the City essentially concedes—that it failed to give Crites proper notice under the FMLA and its regulations. Nevertheless, the Supreme Court made clear in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89–92 (2002), that even if an employer violates FMLA provisions, the Act "provides no relief unless the employee has been prejudiced by the violation." Absent from Plaintiff's evidence is any showing of prejudice. He cites nothing to show that had he received

proper notice of all FMLA rules, requirements, and benefits, he would have invoked FMLA leave in a way that would have prevented his claimed loss or injury. *Cf. Ragsdale*, 535 U.S. at 91 (prejudice inquiry asks, "what steps the employee would have taken had circumstances been different—considering, for example, when the employee would have returned to work after taking leave"); *Vannoy v. Fed. Res. Bank of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016) ("Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his leave differently").

Under the City's policies, Plaintiff obtained a total of 34 weeks of paid leave for a period in which he was medically unable to work. At the end of that period, he had the option of taking an additional 12 weeks of unpaid FMLA leave. Plaintiff never attempted to exercise that FMLA option and cites no evidence that he would have done so had he been better informed. He fails to specify or cite evidence of what he would have done differently had he been given proper FMLA notice. *Cf. Lujan v. Exide Technologies*, No. 10-4023-JTM, 2012 WL 380270, *15 (D. Kan. Feb. 6, 2012) ("Under *Ragsdale*, this court must determine whether [the employer's] failure to give notice prejudiced [plaintiff], that is whether he would have acted differently had he known he was taking FMLA leave").

Plaintiff asserts that the City was on notice that his leave "no later than November 12, 2014, was FMLA-protected leave," and argues that he was therefore entitled to FMLA benefits "instead of termination of his employment due to an FMLA-qualifying reason." (Doc. 68 at 63). He further argues the City's policy requiring him to use paid leave before FMLA leave was contrary to the FMLA because "[e]very court to consider this issue …

20

has concluded that an employer cannot defer FMLA-protected leave by requiring its employees to first exhaust their paid leave." (Doc. 68 at 58) (citing, *inter alia*, *Strickland v. Water Works and Sewer Bd. of the City of Birmingham*, 239 F.3d 1199 (11th Cir. 2001)). The court finds no such holding in the cases cited by Plaintiff. What *Strickland* and other cases make clear is that an employer cannot circumvent or avoid the FMLA requirement that employees be granted the benefits of the Act, including a minimum of 12 weeks of medical leave in a 12-month period. But the City did not circumvent its FMLA obligation in this case. It only required sequential use of paid leave and FMLA leave, allowing Plaintiff to take 34 weeks of paid leave before offering him 12 weeks of unpaid FMLA leave.

*Strickland* illustrates the point that an employer cannot avoid the requirements of the FMLA. The employee in that case was terminated one week after notifying his supervisor of a serious health condition, leading him to sue under the FMLA. *Strickland,* 239 F.3d at 1203. The employer's leave policy provided that FMLA leave would run *concurrently* with any accumulated sick leave. Thus, an employee had to use his sick leave for medical absences, and any sick leave used was subtracted from the available 12 weeks of FMLA leave. *Id.* at 1205, n.6. If an employee's paid sick leave became exhausted, he would then be on unpaid leave for the remainder of the 12 weeks. The district court in *Strickland* found that the employee "had not exhausted his paid leave time under [the employer's] sick leave policy, [and therefore] he could not invoke the protections of the

FMLA." *Id*. at 1203.[3] The Eleventh Circuit reversed, stating that "an employer cannot escape liability under the Act for the period during which the employee, whose leave qualifies under the FMLA, is receiving his wages in the form of sick (or other) pay." *Id*. at 1205. If employers "could evade the FMLA by providing their employees with sick leave benefits," then they could "elect to have the absence count as paid sick leave rather than FMLA leave and would then be free to discharge [the employee] without running afoul of the Act." *Id*. *Strickland* thus makes clear that qualifying employees must be given the minimum 12 weeks of leave required by the FMLA. But it says nothing about this situation, where Plaintiff was able to take 34 weeks of paid leave before having the option of taking 12 additional weeks of unpaid FMLA leave.

Plaintiff's suggestion that he should have been allowed to invoke or substitute FMLA leave beginning in November of 2014 fails to account for the fact that FMLA leave is limited to a 12-week annual period. Had Plaintiff taken FMLA leave in November 2014, he obviously would have exhausted the 12 weeks guaranteed by the Act long before his termination in April 2015. The record thus shows no prejudice to Plaintiff from the City's failure to inform him of FMLA rights in November of 2014 or from a failure to let him claim FMLA leave at that time.

Once his paid leave was exhausted, Plaintiff was entitled to take up to 12 additional weeks of FMLA leave if he so desired. That fact was set forth in the City's personnel manual and was indicated in Chief Whitfield's April 1 letter telling him that

---

[3] The employee had 16 hours of sick leave remaining at the time. *Strickland*, 239 F.3d at 1204, n.3.

"[i]f you need to take more time after [Plaintiff's paid leave runs out], you will need to get the appropriate FMLA paperwork filled out." Plaintiff does not claim that he failed to understand that he could seek unpaid FMLA leave at that point, nor does he explain why he did not attempt to do so. He cites no testimony or other evidence to show that, but for the City's termination of his employment or other actions, he would have applied for and taken non-paid FMLA leave when his paid leave ran out. As the City points out, Plaintiff simply does not address that question. The only evidence cited suggests Plaintiff would not have taken unpaid FMLA leave, as he was insistent upon returning to work because he could not afford to go without pay. Plaintiff admits that he told Dr. Crosby during an April 20, 2015 appointment that he was "running out of benefits" and needed to go back to work. (Doc. 68 at 34). Plaintiff also fails to properly controvert the City's assertion that Plaintiff indicated to Dr. Nystrom that his primary motivation for wanting to return to unrestricted duty was because his employee benefits had been exhausted. (*Id.* at 48). Finally, Plaintiff testified in his deposition that he was the sole provider for his family and that he "needed to return to work, any work." (Doc. 68-1 at 122). In sum, Plaintiff cites no evidence that he intended to or would have taken unpaid FMLA leave.

Plaintiff claims the City interfered with the FMLA right to restoration to a former position upon return from leave, given that it refused to reinstate him despite a certificate from his own medical provider stating he could perform the job. *See* 29 U.S.C. § 2614(a)(1) (any eligible employee who takes leave under § 2612, upon return from such leave, shall be restored to the former position or an equivalent one). However, Plaintiff never took FMLA leave.  Accordingly, the statutory requirements on which he relies do not apply.

Rather, the benefits associated with FMLA leave, including the right to be restored to the position formerly held, are limited to the statutory 12-week period of FMLA leave.[4] To extend this right to any period of leave granted in addition to FMLA leave would discourage employers from adopting more generous leave policies. *Cf.* 29 C.F.R. § 825.770 ("If an employer provides greater unpaid family leave rights than are afforded by FMLA, the employer is not required to extend additional rights afforded by FMLA, such as maintenance of health benefits…, to the additional leave period not covered by FMLA."). Again, the bottom line is that Plaintiff was provided with a total of 34 weeks of paid leave for a serious medical condition and the option of taking an additional 12 weeks of unpaid FMLA leave. At the end of his paid leave, he chose not to seek unpaid FMLA leave. *See McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999) ("Where an employer … exceeds the baseline 12 weeks by providing not only more leave than FMLA but also paid leave, the employer should not find itself sued for violating FMLA."). The uncontroverted facts show no FMLA interference because Plaintiff never tried to take FMLA leave.  Alternatively, Plaintiff shows no prejudice from any FMLA violation.

In sum, because Plaintiff fails to cite evidence of prejudice from any FMLA violation, the court finds the City is entitled to summary judgment on Plaintiff's FMLA claim, including his claim for damages, equitable relief, and liquidated damages. *See*

---

[4] Insofar as Plaintiff contends he was prejudiced by having to get a fitness-for-duty certification from Dr. Nystrom, the FMLA does not prevent an employer from following the procedures for requesting medical information under the ADA, 29 C.F.R. § 825.312(h), and the City claims this evaluation was permissible under the ADA. Accordingly, the court addresses the certification issue below with respect to Plaintiff's ADA claim.

§ 2617 (employer who violates § 2615 may be liable for economic damages resulting from the violation, equitable relief, and liquidated damages).

**B. ADA Claim.**

1. Summary of ADA arguments. Plaintiff contends the City violated his rights under the ADA by requiring him to submit to a fitness-for-duty certification with Dr. Nystrom.[5] He argues the evaluation did not meet ADA requirements for being job-related and consistent with business necessity, and that the evidence raises questions about Chief Whitfield's motive and basis for ordering the evaluation. Plaintiff also contends the City discriminated against him in violation of the ADA and the Rehabilitation Act by terminating his employment based on a disability or perceived disability.

The City disputes Plaintiff's contentions, arguing that he cannot establish a prima facie case of ADA discrimination because he was not qualified to perform the essential functions of his job, as shown by the report of Dr. Nystrom, "[t]he only psychologist who performed psychological testing on plaintiff...." (Doc. 61 at 27.)  Even if Plaintiff could make out a prima facie case, the City argues it had a legitimate, non-discriminatory reason for terminating Plaintiff in light of Dr. Nystrom's opinion. The City asserts various other arguments and contentions that the court will address later in the analysis.

2. Summary of ADA requirements. The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to job application procedures, the

---

[5] Plaintiff also contends the required fitness-for-duty evaluation with Dr. Rey was not justified by business necessity, but concedes he was not harmed by it because Dr. Rey found he was fit to return to duty. (Doc. 68 at 70).

hiring, advancement, or discharge of employees, employee compensation, … and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" means one who, with or without reasonable accommodation, can perform the essential functions of the position. *Id.* § 12111(8).

The prohibition against disability discrimination generally includes requiring medical exams and inquiries. *Id.* § 12112(d)(1). An employer covered by the ADA "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." *Id.* § 12112(d)(4)(A).

When a claim of discrimination is based on circumstantial evidence, the court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) in analyzing the claim. *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017). Under that framework, "a plaintiff must first establish a prima facie case of ADA discrimination by proving '(1) he is disabled (or perceived as disabled) as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered discrimination as a result of his disability.'" *Id.* (citation omitted). "If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If it does so, the burden shifts back to the plaintiff to show that the defendant's stated reason is pretextual." *Id.* (citations and internal quotations marks omitted).

3. <u>Merits of ADA claim</u>. For purposes of summary judgment, the City concedes that Plaintiff's PTSD was a disability within the meaning of the ADA. (Doc. 61 at 37.) But it contends Plaintiff fails to establish the second element of a prima facie case because Dr. Nystrom's opinion shows it is "uncontroverted that plaintiff could not perform the essential functions of the job...." (Doc. 61 at 36.)  This argument misapprehends the plaintiff's burden. A plaintiff shows he is qualified at the prima facie stage "by presenting some credible evidence that [he] possesses the objective qualifications necessary to perform the job at issue." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1194 (10th Cir. 2000). The City's argument ignores Plaintiff's evidence —namely, Dr. Crosby's opinion that Plaintiff could return to work and could perform the various functions required by his job. A reasonable jury could find this evidence credible and conclude it is sufficient to show that Plaintiff could perform the essential functions of the position. Plaintiff further claims that requiring him to undergo a fitness-for-duty evaluation with Dr. Nystrom and terminating his employment were both discriminatory acts under the third element of his prima facie case.  Since the City does not challenge the first or the third element of Plaintiff's prima facie case, the court finds that Plaintiff has met his burden of establishing a prima facie case of discrimination.

In response to Plaintiff's prima facie case, the City contends that requiring the evaluation with Dr. Nystrom was consistent with business necessity (Doc. 61 at 27) and that Plaintiff's termination was based on the "recommendation from an experienced licensed psychologist, Dr. Nystrom, and on Plaintiff's refusal to accept the offered alternative employment...." (*Id*. at 38.) For the reasons explained below, the court

concludes that although the City has cited legitimate, non-discriminatory reasons for these actions, Plaintiff has nevertheless cited evidence of pretext sufficient to raise a genuine issue of fact as to whether the City's actions constituted discrimination on the basis of a disability in violation of the ADA.

Pretext may be shown by evidence of "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006). A combination of circumstances here might give rise to a reasonable inference of pretext. First, Plaintiff has cited evidence that after he was on extended leave due to his disability, Chief Whitfield directed Captain Powers to review employment records for instances of negative performance by Plaintiff. (Doc. 68-4 at 84-86.) No evidence is cited that he was likewise interested in reports of positive performance. Whitfield then used the negative information to draft a disciplinary report against Plaintiff. Although the report was not placed in Plaintiff's file, viewed in the light most favorable to Plaintiff it could raise an inference that the Chief was searching for a pretextual reason to terminate Plaintiff on account of his disability, rather than because of genuine concerns over Plaintiff's past performance. Second, Chief Whitfield acted to ensure that a new release-to-work form was specifically required as a condition of Plaintiff's return to work, but when the form was completed favorably by Plaintiff's medical provider, Chief Whitfield refused to reinstate Plaintiff. During the same period,

Whitfield emailed KS-CPOST inquiring whether an officer with PTSD was disqualified from law enforcement certification.  Significantly, the Chief's demeanor and inquiries at the April 27, 2015, meeting indicate what a fact-finder could view as animus towards Plaintiff on account of his disability. That meeting was concededly confrontational, with Chief Whitfield and Captain Powers questioning whether Plaintiff was mentally prepared to return (despite the release from Plaintiff's doctor), accusing him of insubordination, asserting that he did not complete projects in the past, and telling him others were worried about his ability to perform.  Being thus confronted by his supervisors, Plaintiff exhibited signs of nervousness and emotion, but a jury could find his behavior was not disproportionate to the circumstances. A jury could also find that the Chief's later assertion to Dr. Nystrom that Plaintiff's behavior at the meeting indicated he was not ready to come back was itself a product of animus on account of a disability or perceived disability, rather than a genuine assessment.

Other factors also contribute to a genuine issue of pretext. In 2014, when Plaintiff took leave, the City had no written policy requiring a fitness-for-duty certification for extended absences. In May of 2015, however, a policy was added to the City's personnel manual, apparently because of Plaintiff's situation. It required a person on leave for six months "to pass a fit-for-duty test administered by the City's workers' compensation doctor prior to returning to work." Plaintiff submitted to a fitness-for-duty examination by the City's workers compensation doctor, Dr. Rey, and was found to be fit for duty. Under the terms of the policy, then, it appears that Plaintiff should have been reinstated. But Chief Whitfield decided to require Plaintiff to submit to an evaluation by Dr.

Nystrom. While it is true that Dr. Nystrom was a psychological specialist while Dr. Rey was not, this might be construed as a variance from the written policy, and when considered with the evidence noted above, it could be considered by a jury as undermining Chief Whitfield's asserted reliance on Dr. Nystrom's evaluation. That is particularly true given that Dr. Rey and Dr. Crosby (a specialist in PTSD) opined that Plaintiff was capable of returning to work.

A jury could reasonably credit the City's explanation that its actions were based on legitimate concerns about Plaintiff's performance and its acceptance of Dr. Nystrom's opinion. But viewing the evidence and all reasonable inferences in the light most favorable to the Plaintiff, as the court is bound to do on summary judgment, a reasonable jury could also conclude that the City's stated explanations are not worthy of belief, and that discrimination on account of a disability or perceived disability was a determining factor in the City's actions. The City's motion for summary judgment will therefore be denied as to Plaintiff's ADA claim.

**IT IS THEREFORE ORDERED** this 16th day of May, 2018, that the City of Haysville's Motion for Summary Judgment (Doc. 60) is GRANTED IN PART AND DENIED IN PART. The motion is granted with respect to Plaintiff's FMLA claim, and denied with respect to Plaintiff's ADA claim.

       ___s/ John W. Broomes_____
       JOHN W. BROOMES
       UNITED STATES DISTRICT JUDGE